UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DR. HUSSEIN A. SAAD, M.D.,                     Case No. 24-cv-10514

     Plaintiff,                               F. Kay Behm
v.                                             United States District Judge

HEALTHGRADES
MARKETPLACE, LLC, a foreign
limited liability company and
RVO HEALTH, LLC, a foreign
limited liability company,

     Defendant(s).
_____ /

## OPINION AND ORDER ON DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT (ECF No. 10)

## I.  PROCEDURAL HISTORY

This matter is before the court on Defendant's Motion to Dismiss

Plaintiff's First Amended Complaint (ECF No. 10).  Plaintiff, Dr.

Hussein A. Saad ("Saad"), filed this case on January 23, 2024 in Wayne

County Circuit Court, where it was assigned Case No. 24-001108-CZ

(the "State Court Action").  Pursuant to 28 U.S.C. §§ 1332, 1441 and

1446, Defendants Healthgrades Marketplace, LLC ("Healthgrades") and

RVO Health, LLC ("RVO") (collectively "Defendants") removed this case

to federal district court on February 28, 2024.  In response to

1

Defendants' first Motion to Dismiss (ECF No. 6), Plaintiff submitted his

First Amended Complaint (ECF No. 8) ("FAC").  Defendants then

submitted the instant motion (ECF No. 10) ("Motion to Dismiss").

Plaintiff responded at ECF No. 11 ("Plaintiff's Response"), and

Defendants replied (ECF No. 12) ("Def's Reply").

Saad brings three claims as a result of a false statement being

published about him on Defendants' website: defamation (Count I),

intentional infliction of emotional distress (Count II), and tortious

interference with a business relationship or expectancy (Count III).  For

the reasons discussed below, the Court **DENIES** the Motion as to

Counts I and III but **GRANTS** Defendant's Motion as to Count II.

## II.    FACTUAL BACKGROUND

Plaintiff Dr. Hussein Saad is an orthopedic surgeon, board

certified by the American Board of Orthopaedic Surgery, and has been

practicing in the field of orthopedic surgery in the State of Michigan for

over a decade.  ECF No. 11, PageID.144-45.  Dr. Saad alleges that his

medical license has never been suspended, revoked, or otherwise

limited in any manner.  FAC, ECF No. 8, PageID.73.  In his Amended

Complaint, Saad alleges that he has a unique National Provider

2

Identifier ("NPI") and Drug Enforcement Administration ("DEA")

number under which he practices medicine.  *Id.*

Defendants own and operate the web-platform

www.healthgrades.com ("Healthgrades.com"), which labels itself as the

leading online resource for comprehensive information about physicians

and hospitals.  ECF No. 11, PageID.145; ECF No. 10, PageID.100.

Healthgrades.com is a site where patients or patients' families can go to

search for information about their doctor, including patient reviews,

board certifications, board action checks, locations they practice at,

affiliated hospitals, and whether a doctor accepts their insurance.  *See*

Healthgrades, healthgrades.com (last visited Oct. 8, 2024),

https://perma.cc/L53S-U9PX.  Saad alleges that RVO and Healthgrades

published information on his Healthgrades website profile stating that

his medical license was suspended and he had been criminally convicted

of insurance fraud.

The following excerpt was posted on Defendants' website under

Plaintiff's "Background Check" tab from approximately May 3, 2023 to

November 10, 2023:

> **Background Check**
>
> ⚠ **1 Disciplinary Action Found**
>
> Criminal Conviction (5/3/2023)  **Hide details**
> Action Taken: Suspension
> Summary: NATURE OF COMPLAINT: The physician engaged in Criminal
> Conviction; Incompetence; Insurance Fraud; Lack of Good Moral Character
> and Negligence. ACTION TAKEN: The MIchigan Department of Licensing
> and Regulatory Affairs DISSOLVED the summary suspension, imposed a
> FINE and placed the physician's license on SUSPENSION>
> State: Michigan

ECF No. 8, PageID.75.

Saad alleges that at least one of his patients saw this on the
Healthgrades site; that patient presented this excerpt to Dr. Saad's
office and said that she had "looked up his name" on Healthgrades and
learned that Dr. Saad "had a criminal conviction" and that "his licensed
was suspended."  ECF No. 8, PageID.74.

Upon information and belief, Plaintiff alleges "several patients of
Plaintiff have reported to being turned appalled by the information
published by Defendants, and therefore refused to be seen by Plaintiff
for medical treatment into the future in light of the disparaging,
defamatory statements made by the Defendants."  ECF No. 8,
PageID.79.

Defendants allege this was a case of mistaken identity.  According
to their briefing, Plaintiff shares the same name and works in the same

city as another Dr. Hussein Saad (middle initial "T") who was convicted of federal opioid-related charges.  *See* ECF No. 10-2, PageID.132 (Michigan Department of Licensing and Regulatory Affairs, order suspending medical license of Hussein Toufic Saad, M.D.).  Because Defendants argue the statements were made by mistake and not recklessly, they argue the statements are not actionable.

## III.  STANDARD OF REVIEW

In deciding a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a court must "construe the complaint in the light most favorable to the [nonmoving party] . . . [and] accept all well-pled factual allegations as true*." League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007); *see also Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 562 (6th Cir. 2003).  The complaint must provide "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  Moreover, the complaint must "contain[] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009).  A claim has "facial

5

plausibility" when the nonmoving party pleads facts that "allow[] the court to draw the reasonable inference that the [moving party] is liable for the misconduct alleged." *Id.* at 678.  The factual allegations "must do more than create speculation or suspicion of a legally cognizable cause of action; they must show entitlement to relief." *League of United Latin Am. Citizens*, 500 F.3d at 527.

In evaluating the allegations in the complaint, the court must be mindful of its limited task when presented with a motion to dismiss under Rule 12(b)(6).  At the motion to dismiss stage, the court does not consider whether the factual allegations are probably true; instead the court must accept the factual allegations as true, even when skeptical. *See Twombly*, 550 U.S. at 555 (a court must proceed "on the assumption that all the allegations in the complaint are true (even if doubtful in fact)"); *Neitzke v. Williams*, 490 U.S. 319, 327 (1989) ("Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations").  Indeed, in assessing the sufficiency of a complaint, the court must determine only whether "'the claimant is entitled to offer evidence to support the claims,' not whether the plaintiff can ultimately prove the facts alleged." *See United States v.*

*SouthEast Eye Specialists, PLLC*, 570 F. Supp. 3d 561, 574 (M.D. Tenn. 2021) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002)).

In general, when deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), a court's review is limited to the four corners of the pleading at issue. Fed. R. Civ. P 12(d); *see also Courser v. Michigan House of Representatives*, 404 F. Supp. 3d 1125, 1139 (W.D. Mich. 2019) (citing *Rondigo, LLC v. Twp. of Richmond*, 641 F.3d 673, 682 (6th Cir. 2011)) (noting that "[i]n general, in deciding a Rule 12(b)(6) motion to dismiss the court is limited to considering only the pleadings").  Nonetheless, it is well established that, in some circumstances, a court may consider matters beyond the pleadings without converting the motion to one for summary judgment under Rule 56.  Examples include "any exhibits attached [to the Complaint], public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein."  *Bassett v. NCAA*, 528 F.3d 426, 430 (6th Cir. 2008).

This case is before the court on the basis of diversity jurisdiction under 28 U.S.C. § 1332, and Saad's claim is based entirely on state law. The task of this court, sitting in diversity, is to apply the same law as

would be applied by the Michigan state courts. *See Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938). Where a state's highest court has spoken to an issue, this court is bound by that decision unless it is convinced that the high court would overrule it if confronted with facts similar to those before it. *Bernhardt v. Polygraphic Co. of Am.*, 350 U.S. 198, 205 (1956). Moreover, where a state appellate court has resolved an issue to which the high court has not spoken, federal courts should "treat [those] decisions . . . as authoritative absent a strong showing that the state's highest court would decide the issue differently." *Garrett v. Akron-Cleveland Auto Rental, Inc. (In re Akron-Cleveland Auto Rental, Inc.)*, 921 F.2d 659, 662 (6th Cir. 1990).

## IV.   ANALYSIS

This case presents a question of the reach of Michigan's defamation law in the Digital Age. Accepting Saad's allegations as true, as the court must at this stage, he essentially alleges that a trusted website – purporting to give patients and consumers accurate information about their doctors – instead listed him as a criminal who was not currently licensed to practice medicine. Defendants' Motion would foreclose all avenues to recovery presented in Saad's complaint and would have this court hold that they get to make that error without

8

legal consequence.  Since Michigan defamation law does not offer a mulligan, and Saad fairly pleads enough facts at this stage to prove that Defendants acted with reckless disregard for the truth, Defendants' motion is denied as to Counts I and III, but the court grants their motion as to Count II.

### A.  Defamation

A plaintiff can establish a defamation claim by showing: (1) a false and defamatory statement concerning the plaintiff; (2) an unprivileged publication to a third party, (3) fault amounting at least to negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by the publication (defamation per quod).  *Ireland v. Edwards*, 230 Mich. App. 607, 614 (1998).  Saad claims that Defendants' publication of false information about him on their website amounts to defamation.  But Defendants assert that "[u]nder Michigan law, communications are protected by a qualified privilege (even if false) if they are made in furtherance of a duty to a third-party or the public welfare."  ECF No. 10, PageID.103.  "Qualified privilege 'extends to all communications made bona fide upon any subject-matter in which the party communicating has an interest, or in

9

reference to which he has a duty to a person having a corresponding interest or duty.'" *Id.* (quoting *Timmis v. Bennett*, 352 Mich. 355, 366 (1958)).  Because Defendants are speaking on a matter of public concern or under a duty to a third party, under their interpretation, Saad must plead (and eventually prove) actual malice rather than negligence.  *See, e.g.*, *Gaynes v. Allen*, 128 Mich. App. 42, 52 (1983).  Defendants misconstrue the law as applied to their publication; Michigan's defamation law is not so anemic.

The Michigan Supreme Court has repeatedly emphasized the general rule that a defamation defendant is not entitled to a qualified privilege in a case involving a private-figure plaintiff, even if the private-figure plaintiff was defamed in the course of a discussion of an issue of public concern.  *Rouch v. Enquirer & News*, 427 Mich. 157 (1986); *Lakeshore Community Hosp. v. Perry*, 212 Mich. App. 396 (1995); *J & J Constr. Co. v. Bricklayers & Allied Craftsmen, Local 1*, 468 Mich. 722 (2003).  The Michigan Legislature codified this standard in 1988, statutorily providing that defamation of a private figure requires only a showing of negligence, not actual malice.  Mich. Comp. Laws § 600.2911(7); *J & J Constr. Co.*, 468 Mich. at 734.

Because this claim is central to Defendants' argument, and because Defendant collects cases that could be read to apply a qualified privilege to their publication, the court will expand on why it is the case that the qualified privilege does not extend to the situation at hand and why neither the duty-interest exception nor a public interest exception applies.

A qualified privilege to speak on matters in the public interest is deeply rooted in Michigan's historical law of defamation going back to the 19th century.  *See, e.g.*, *Miner v. Post & Tribune Co.*, 49 Mich. 358 (1882) (extending a public-interest privilege to a newspaper publisher). So too is a duty-interest version of a qualified privilege; in *Bacon v. Mich. Cent. R.R. Co.*, 66 Mich. 166 (1887), the Michigan Supreme Court held that a qualified privilege extended "to all communications made bona fide upon any subject-matter in which the party communicating has an interest, or in reference to which he has a duty, to a person having a corresponding interest or duty.  And the privilege embraces cases where the duty is not a legal one, but where it is of a moral or social character of imperfect obligation."  *Id.* at 170.  The "duty" in that case was held by the defendant railroad employee, who had published an internal report noting that the plaintiff (a former employee) had

been discharged for stealing. The Court reasoned that the employee who made the communication owed a duty to the company in the capacity of personnel agent. *Id.*; *see Rouch*, 427 Mich. at 176.

The Michigan Supreme Court attempted to bring some order to the determination of what constitutes a qualified privilege in the 1950s, holding that the elements of determining whether a privilege exists are: (1) good faith; (2) an interest to be upheld; (3) a statement limited in scope to this purpose; (4) a proper occasion; and (5) publication in a proper manner and to proper parties only. *See Timmis v. Bennett*, 352 Mich. 355, 358 (1958); *Bufalino v. Maxon Bros, Inc.*, 368 Mich 140, 153 (1962). Particular attention should be paid, in this court's view, to the Michigan Supreme Court's requirements that the statement be "limited in scope," that it be limited to a "proper occasion," and that it be "to proper parties only." *See id.* As this court will later expand on, these limitations are intended to recognize that the privilege extends not to publications to the public at large, but a limited publication to "proper parties only."

The bounds of this qualified privilege were debated by the Michigan Court of Appeals into the early 1980s, and it is true that at least some Michigan courts at one point had moved toward recognizing

a qualified privilege to make reports to the public on matters of public interest in cases involving private-figure plaintiffs.  *See, e.g.*, *Peisner v. Detroit Free Press*, 104 Mich. App. 59 (1981), *aff'd but modified* 421 Mich. 125 (1984) ("malice" and damages issues) (*Peisner II*).  For example, in *Gaynes v. Allen*, 128 Mich. App. 42 (1983), the Michigan Court of Appeals considered the application of the public interest or duty exception to a case similar to this one.  In that case, a plaintiff challenged the publication of statements concerning his competency as an optometrist.  An organization of ophthalmologists[1] "publish[ed] a newspaper, The PEN, which was distributed to ophthalmologists and other interested persons," and "exist[ed] for the purpose of informing its members and the public as to matters which affect the quality of health care and, particularly, as to the qualifications of health care providers."  *Id.* at 43-44.  The court said:

> The purpose of defendant Physicians Education Network, Inc., is to disseminate information as to matters of health care.  The published information related to treatment rendered by plaintiff optometrist, who allegedly failed to recognize a medical problem beyond his level of competence.  Ophthalmologists and the general public have a vital interest in the proper delivery

---

[1] The plaintiff was an optometrist, and the organization was a nonprofit organization of ophthalmologists.

13

>    of eye care services and in being informed of the
>    level of competence of health care deliverers.  The
>    issue to which the allegedly defamatory article
>    addressed itself is one deserving of robust public
>    debate.  We hold the published information was a
>    matter of legitimate public concern and that
>    defendants had a qualified privilege to publish it.

*Gaynes*, 128 Mich. App. at 48-49.

    *Gaynes* (and a few cases from that era) thus relies on logic which

sounds strikingly similar to the arguments advanced in the instant

case.  Defendants urge this court to recognize that, "Healthgrades

provides an important public service to people seeking medical care—

providing free, accessible, and complete information about doctors so

that patients can make an informed decision about which doctor best

fits their needs.  In providing this service, Healthgrades has a

responsibility to disclose negative information about doctors."  ECF No.

10, PageID.104

    But the trouble for Defendants is this: the Michigan Supreme

Court rejected this trend of the Court of Appeals, represented by

*Peisner* and *Gaynes*, in *Rouch v. Enquirer & News*, 427 Mich. 157

(1986), which represents a firm turning point in Michigan defamation

law.  In *Rouch*, the Michigan Supreme Court set out to redefine and

clarify the state of Michigan defamation law "in the wake of a veritable

revolution in First Amendment defamation law." After surveying the case law at the time, the Court concluded that the public-interest qualified privilege would not apply moving forward to statements about a private-figure plaintiff. *Id.* at 187. *Rouch* and its progeny present a formidable counter to Defendants' preferred interpretation of the qualified privilege. For example, the only Michigan Supreme Court case Defendants rely on for their qualified privilege argument is *Timmis v. Bennett*, 352 Mich. 355 (1958). In that case, after the plaintiff, a police employee, filed a petition alleging defendant attorney's client was mentally incompetent, the attorney sent an allegedly defamatory letter that the plaintiff claimed caused her to lose her position with the police department. The Court held that the statements might be entitled to qualified privilege because they bore on matters of public concern (a citizen of the community speaking out on law enforcement), but an issue of fact remained as to whether there was an excessive publication and whether there was malice on the part of attorney. *Id.* at 370. As far as Defendants say that *Timmis* can today be used to apply the qualified privilege to private party plaintiffs, *Rouch* implicitly narrowed *Timmis* to apply only to public plaintiffs. *See* 427 Mich. at 183 (noting that *Timmis* involved a plaintiff who would now

likely be considered a "public official[] or figure[]" under the constitutional standard and thus the holding arguably applied only to public-figure plaintiffs).  Meanwhile, *Rouch* also rejected the application of the qualified privilege to a situation like the one here when it dryly characterized *Gaynes* (granting qualified privilege to the public defamation of an optometrist) as an "expansive interpretation of the privilege" while it surveyed the state of existing law, and then subsequently announced the negligence standard for private plaintiffs moving forward.  *See* 427 Mich. at 186-87.

This is not to say that limited exceptions for a qualified privilege were gone completely, despite any doubt that *Rouch* might have cast on qualified privileges in general.  *See id*. at 201 ("[I]t is obvious that the policy imperatives that led to the adoption of many of the qualified privileges, including the public-interest privilege, resulted from the then-existing harshness of the law of libel and the absence of any constitutionally based privilege. As described above, that harshness has been removed.").  Some of the qualified privileges that predated *Rouch* survive today, especially in the employment context.  For example, in the 1970s the Michigan Court of Appeals held that security officers at a grocery store could ask a cashier, who they suspected of stealing $5,

16

where she had put the money in front of other employees.  *See, e.g.*, *Tumbarella v. The Kroger Co.*, 85 Mich App 482, 494 (1978) ("[A]n employer has the qualified privilege to defame an employee by publishing statements to other employees whose duties interest them in the same subject matter.").  And post-*Rouch*, an employer could similarly ask its employees which one of them stole money, therefore implying one of them was a thief.  *See Smith v. Fergan*, 181 Mich. App. 594, 598 (1989).  An employer can also still enjoy a qualified privilege to defame a plaintiff by telling prospective employers that a plaintiff was discharged for dishonest behavior.  *See Gonyea v. Motor Parts Fed. Credit Union*, 192 Mich. App. 74, 79 (1991) ("[A]n employer has a qualified privilege to divulge information regarding a former employee to a prospective employer.").

Occasionally, as Defendants point out, courts have allowed this duty-based privilege to extend beyond the basic employer-employee relationship and encompass other kinds of limited publications to particular parties pursuant to a duty.  A company can make statements to potential buyers regarding financial misconduct by a former employee, for example.  *See Ryniewicz v. Clarivate Analytics*, 803 F. App'x 858 (6th Cir. 2020).  There, the plaintiff was accused of

17

embezzling $11.3 million from her company, but the parent company had been seeking to sell the company or division the plaintiff was involved in.  The qualified privilege applied because the publication was limited to potential buyers in the context of informing those buyers why the contemplated sale had to be aborted, and was otherwise limited to informing other employees that the company was completing an internal investigation about the plaintiff employee's suspected embezzlement.  *See id.* at 858, 862, 868; *see also Bowles v. Macomb Cmty. Coll.*, 558 F. Supp. 3d 539, 553 (E.D. Mich. 2021) (when defendant compliance manager ran internal investigation regarding harassment by plaintiff, finding defendant's communication of the summary of his findings to supervisor entitled to qualified privilege because "[c]reating and communicating findings of his investigations to a proper person is necessarily within the scope of [his] duty").  This kind of privilege can also extend in some circumstances to clients of a business.  In *Prysak v. R L Polk Co.*, 193 Mich. App. 1 (1992), for example, the plaintiff was an employee at a marketing firm who took his car to a car dealership for repair, and the dealership was also a client of the firm.  When a dispute arose between the plaintiff and the dealership, the plaintiff threatened to use his position at the firm to get

the addresses of the dealership's customers and mail the dealership's customers a defamatory letter. *Id.* at 4-5. Because the dealership was a client of the firm and the plaintiff was threatening to abuse their shared relationship with the marketing firm to defame the dealership, the dealership reached out to the firm and told his employer what he'd threatened to do. The qualified privilege applied because the letter was published to the plaintiff's employer from a client and was written in response to perceived threats by the plaintiff to the confidentiality of the client's customer lists. Therefore, its publication was limited in scope to addressing this concern. *Id.* at 15. Defendants similarly point the court to *Another Step Forward v. State Farm Auto. Ins. Co.*, No. 06-CV-15250, 2009 U.S. Dist. LEXIS 27622 (E.D. Mich. Mar. 30, 2009). The plaintiffs in *Another Step Forward* were Michigan corporations "engaged in the business of providing rehabilitation services to individuals who suffer from traumatic brain injuries, addictive disorders and psychiatric disorders." *Id.* at \*1. State Farm Insurance allegedly told numerous third parties that Plaintiffs were not licensed (which was true, and therefore not defamatory). *Id.* at \*35. Still, the court said, even had that not been true, State Farm had an interest to communicate with its insureds that the facilities providing treatment to

them were not properly licensed.  *Id.* at *36-37.  But again, the qualified

privilege applied because publication was limited to clients of the

insurer: "the statements appear limited to this purpose, provided on a

proper occasion, and made in a proper manner (non-threatening) and to

proper parties (to the insureds and/or their guardians)."  *Id.* at *37.

Lastly, Defendants point the court to *Lefrock v. Walgreens Co.*, 77 F.

Supp. 3d 1199, 1202 (M.D. Fla. 2015), which the court notes is based on

Florida law, not Michigan law, though it apparently relies on a similar

interpretation of qualified privilege.  But however Defendant tries to

cast that case as being simply about the ability to make defamatory

comments about a physician, the qualified privilege analysis in that

case again relies on the limited nature of the publication to specific

parties pursuant to a duty to those parties:

> The pharmacists made the statements in the
> proper location and manner since they rendered
> the advice to the customers while the customers
> were seeking advice regarding treatments and
> seeking to fill prescriptions. Also, the statements
> were made in the proper manner since the
> statements were limited in scope to the specific
> prescriptions being filled and were not mere
> generalizations.

*Lefrock*, 77 F. Supp. 3d at 1201-02 (also noting that "pharmacists have a

duty to provide competent advice to customers").

20

Thus the cases Defendants cite as the best proof of their proposed qualified privilege (*Ryniewicz, Prysak*, *Another Step Forward*, and *Lefrock*) are instead better understood as applications of an (admittedly not always well-defined) rule that defamation defendants have a qualified privilege for limited-purpose statements made pursuant to a duty *to a limited audience*, tailored to the necessity of the publication and the duty in question.  None of these cases are like the case here.

Defendants assert that the qualified privilege applies here because, in their view, the only people who navigate to Saad's profile on their website are those people with a shared interest in the specific information that they provide, and they have a duty to provide these customers information.  They also point out that the kind of criminal history or licensing information at issue here is only available if a user navigates to a specific doctor's profile and clicks through to view that information.  Thus if a user, who is likely (though not necessarily) a patient or potential patient, bothers to click through the website and navigate to Saad's profile, then they likely have a shared interest in the information that Healthgrades is providing.  Therefore, the theory goes, Healthgrades enjoys a qualified privilege to communicate to that specific person on this specific subject when they have sought out that

information.  *See* ECF No. 10, PageID.104 ("Healthgrades has a responsibility to disclose negative information about doctors" to the patients using its service).

But this theory misleadingly recasts Defendants' publication for public consumption as somehow a private or limited communication only to certain people.  Defendants' reliance on this "click-through" theory or shared interest as a proxy for limited publication is unwarranted – and two simple hypotheticals illustrate why.  If tomorrow Defendants shut down their online presence and instead published a state-by-state, physical phone-book-like catalog of every doctor practicing in-state, with all the same information they currently provide on their website, and they put that physical catalog in every local library in the state (perhaps organized by specialty, geography, and alphabetically by last name), the result would be the same. Practically speaking, it is likely that only a small proportion of people who pick up the catalog would ever flip the lengthy directory to Dr. Saad's page – to do so, a "user" would likely be looking either for doctors working in Saad's same specialty and geographic area, or for people with a very similar name, or for Saad himself.

22

Or imagine that Defendant instead buys a local tv station and starts a 24-hour program where they read off the same information they publish online – maybe with each hour highlighting a different medical specialty. It takes a tv-user several clicks of a remote control to navigate to a particular station on their television, a bit of attention to decide what program to tune in for, and one can fairly assume that few people would tune in to this hypothetical station unless they are enthusiastic about finding the right doctor for their medical needs. In other words, all of the same interest/duty concerns would be present; it is likely that the only people who would actually hear or view the false information about Saad are patients or potential patients with a possible shared interest in the specific information that Healthgrades provides.

But in either hypothetical, as in the actual facts of this case, the publication has not been made in a tailored fashion, limited in scope or made to proper parties only; no tailoring has occurred at all. Just because only a subset of possible readers or viewers might ever come across or seek out the publication doesn't mean that Defendants had a privilege to negligently publish that false information to the public at large. When a false publication is made to the public at large, the

actual readership or viewership is irrelevant to the question of privilege – it is instead an issue of damages regarding the extent of the harm.

This conclusion is supported by longstanding principles regarding publication to the general public.  Just as qualified privileges themselves are deeply rooted in Michigan law, so too is the necessity of limiting those exceptions to publications that are in fact made to a limited audience, as is illustrated in *Hanschke v. Merchs. Credit Bureau*, 256 Mich. 272 (1931).  In that case, the Merchant's Credit Bureau published false information about the plaintiff claiming he had tried to cash a false check.  The Bureau described its purpose as:

> Collecting, compiling, preserving of reports and information concerning the financial standing, reputation and responsibility of individuals, firms and corporations, and for the purpose of furnishing and selling such reports to members of and subscribers to this corporation, and to other persons, firms and corporations . . . .

*Id.* at 274.

In that case, the Bureau "contract[ed] with subscribers and members to furnish such information on request."  *Id.* at 274.  But the defamatory publication at issue was sent, not just to its 700 paid members in Detroit, but also "gratuitously" to others outside of the city (including the Border Cities Credit Bureau of Windsor, Ontario, the

24

credit bureau of Flint, Michigan, the credit bureau of Pontiac, and the credit bureau of Saginaw and Port Huron). *Id.* at 275. That court did not decide whether a privileged relationship existed between the Bureau and its subscribers, but said that if "a privilege relation existed between the defendant bureau and its subscribers, it certainly cannot be extended to outsiders." *Id.* Fifty-five years later, *Rouch* further explained why negligence must be the general rule for private figure defamation plaintiffs, especially as the availability and capability of media increases, and why a qualified privilege should not be expansively interpreted to include statements available to any member of the public at large:

> The policy question then, as we see it, is whether, in a time when the media has developed the technology, expertise, and resources to bring to our eyes and ears, on an hourly basis, detailed information on almost any subject from anywhere in the world, it is too much to ask or too detrimental to the liberalizing influence of such a free flow of information that the task be exercised with reasonable care. We think not.

*Rouch v. Enquirer & News*, 427 Mich. 157, 202 (1986).

Defendants' theory would go the opposite way; because they are capable of publishing a massive amount of information about lots of different people at once, they need not exercise reasonable care in doing

so.  That logic would become the exception that swallows the rule:
granting digital publishers a shield of privilege when they put
information freely available online, as long as they plausibly assert a
shared interest with, and a duty to, their readers and viewers.
Michigan law does not support that interpretation.

Therefore, whether or not Saad (a private-figure defamation
plaintiff)[2] has adequately pleaded malice is irrelevant; the question is
only whether he has pleaded negligence.  He has done so, and
Defendants' motion is denied as to Count I.

## B.     Intentional Infliction of Emotional Distress

In his second court, Saad alleges that Defendant published the
false information in his "background check" intentionally and in
reckless disregard of the truth, that it was extreme and outrageous to
do so, and that Saad experienced severe emotional distress as a result.
ECF No. 8, PageID.78.  The elements of intentional infliction of
emotional distress ("IIED") are (1) extreme and outrageous conduct; (2)
intent or recklessness; (3) causation; and (4) severe emotional distress.
*Roberts v. Auto-Owners Ins Co*, 422 Mich. 594, 602 (1985).  "The

---

[2] Defendants do not challenge Saad's status as a private figure.

threshold for showing extreme and outrageous conduct is high," and "[n]o cause of action will necessarily lie even where a defendant acts with tortious or even criminal intent." *VanVorous v. Burmeister*, 262 Mich. App. 467, 481 (2004).

Defendants argue that the conduct at issue in this case cannot be "extreme and outrageous" as a matter of law. ECF No. 12, PageID.182. In their view, the "erroneous publication of information concerning the Plaintiff on a website for a limited period of time, which was removed immediately upon Plaintiff notifying Defendants of the error, does not meet the high standard of "extreme and outrageous" conduct. ECF No. 10, PageID.109.

Plaintiff responds that the issue is a question of fact because several witnesses will testify that labeling Dr. Saad a criminal would be outrageous conduct. ECF No. 11, PageID.155. In particular, Saad contends that Defendants' conduct rises above the "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities" standard because "labeling a medical professional a criminal or drug dealer may be the worst statement one can make regarding his work." *Id.*

27

Plaintiff's claim fails as a matter of law because he fails to plead facts that, even if true, are sufficient to establish that the conduct was "extreme and outrageous." Liability on an IIED claim has been found only where the conduct complained of has been "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. Accordingly, liability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Lucas v. Awaad*, 299 Mich. App. 345, 359 (2013). "The test to determine whether a person's conduct was extreme and outrageous is whether recitation of the facts of the case to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Lewis v. LeGrow*, 258 Mich. App. 175, 196 (2003). Generally, it is the trial court's duty to determine whether the defendant's conduct is extreme and outrageous. *Id.* at 197. However, if reasonable minds could differ on the subject, it is a question of fact for the jury. *Id.*

The Michigan Court of Appeals considered a similar situation to this case in *Todd v. NBC Universal MSNBC*, No. 323235, 2015 Mich. App. LEXIS 2301 (Ct. App. Dec. 10, 2015). The defendant had aired an

28

episode of "Caught on Camera: Dash Cam Diaries 3," in which plaintiff Keith Todd was falsely identified as the perpetrator of a crime (who was in fact similarly named Todd Keith).  *Id.* at *1-2.  The episode was periodically re-aired with the false identification from August 2011 to February 2014, and according to plaintiff, he only became aware of it about it in November 2013 after his uncle and friends alerted him.  *Id.*

That court concluded that "[w]hile the conduct at issue may have been unpleasant and even disturbing, the threshold for proving extreme and outrageous conduct is great."  *Id.* at *13-14 (quoting *VanVorous*, 262 Mich. App. at 481).  The instant case presents comparable facts as *Todd.*  Plaintiff here similarly asserts that Defendant mistakenly or recklessly[3] disseminated information about him that falsely identified him as a criminal.  While unfortunate, this conduct falls within the boundaries of "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities" and does not rise to the level of intentional infliction of emotional distress.  *Id.*, *see Lucas*, 299 Mich. App. at 359.  Even though there may be heightened effect to the

---

[3] Specifically, he says that "Defendants failed to utilize any semblance of reasonable due diligence prior to publishing" the false information.  ECF No. 8, PageID.76.

plaintiff here because of his profession, the inquiry is based not on the characteristics of a given plaintiff but on the character of the conduct itself, and the court cannot find that this conduct was "beyond all possible bounds of decency" or "atrocious and utterly intolerable in a civilized community."  299 Mich. App. at 359.

### C.   Tortious Interference with a Business Relationship

The elements of tortious interference with a business relationship are 1) the existence of a valid business relationship or expectancy, 2) knowledge of the relationship or expectancy on the part of the defendant, 3) an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy, and 4) resultant damage to the plaintiff.  *Lakeshore Community Hosp v. Perry*, 212 Mich. App. 396, 401 (1995).  To establish the third element of intentional interference, a plaintiff must allege either "the intentional doing of a per se wrongful act or the doing of a lawful act with malice and unjustified in law for the purpose of invading the contractual rights or business relationship of another."  *CMI Intern, Inc. v. Internet Intern Corp.*, 251 Mich. App. 125, 131 (2002).  Tortious interference may be caused by defamatory statements.  *Perry*, 212 Mich. App. at 401.

To establish that a lawful act was done with malice and without justification, the plaintiff must demonstrate, with specificity, affirmative acts by the defendant that corroborate the improper motive of the interference. *Feldman v. Green*, 138 Mich. App. 360, 369 (1984). Where the defendant's actions were motivated by legitimate business reasons, its actions are often justified and would not constitute improper motive or interference. *See BPS Clinical Labs. v. Blue Cross & Blue Shield*, 217 Mich. App. 687, 699 (1996) (citing *Michigan Podiatric Medical Ass'n v. Nat'l Foot Care Program, Inc*, 175 Mich. App. 723, 736 (1989)); *see also Saab Auto. AB v. GM Co.*, 770 F.3d 436, 442 (6th Cir. 2014). However, "in nearly all cases of interference, the defendant hopes to benefit by way of a resulting advancement of its personal or business interests[,]" so merely having a motive of legitimate business reasons does not on its own "weave a broad and impenetrable blanket of immunity from liability for those actions." *Jim-Bob, Inc. v. Mehling*, 178 Mich. App. 71, 96 (1989). When considering the propriety of the defendant's actions, courts should therefore assess not just any "legitimate business reasons" but also (1) the nature of the defendant's conduct, (2) the nature of the plaintiff's interest, (3) the social utility of the plaintiff's and the defendant's

respective interests, and (4) the proximity of the defendant's conduct to the interference.  *See id.* at 97.

Defendants run an "online resource for comprehensive information about physicians and hospitals[.]"  ECF No. 11, PageID.145.  As a matter of law, they have a legitimate business reason to want to include licensing information and board actions on a doctor's profile page.  But the purpose of Healthgrades is, at core, to affect business relationships between doctors and patients by providing patients information about their doctors and empowering patients to change providers based on that information.[4]  As to the first factor of assessing the nature of the defendant's conduct, publishing false information about a particular person with reckless disregard for the truth of that information on a site purporting to give consumers reliable information would not be a "legitimate business reason," would not be a motive justified in law, and doing so would not fall under this exception.

On Count III, Saad has alleged that "[t]he conduct described above was intended to, and did, interfere with the contracts and business

_____

[4] Plaintiffs have alleged that the Healthgrades website states that "Healthgrades empowers you to make decisions based on information, not just instinct."  ECF No. 11, PageID.145.

relationships and expectancies, causing the breach, disruption, and/or permanent reputational damage."  FAC, ECF No. 8, PageID.79, ¶ 66). He also says that Defendants acted "with malicious intent as the defamatory statements were published to its website with reckless disregard for the statement's truth."  *Id.* at ¶ 61.

On a 12(b)(6) motion, Plaintiff's burden is to "plead factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  But a "a wholly conclusory statement" does not supply adequate facts to survive a motion to dismiss.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 561 (2007).

Plaintiff admitted at oral argument on this motion that they have no facts in their possession to allow this court to draw the inference that Defendants intentionally published false information about Dr. Saad. But as the court noted above, reckless disregard as the truth of a publication would also not be a lawful purpose and could constitute tortious interference with Saad's business relationships with his patients.  Defendants argue that Plaintiff has not pleaded facts supporting an inference of malice.  The court disagrees.

The Michigan Court of Appeals has described "actual malice" as follows:

> Actual malice is defined as knowledge that the published statement was false or as reckless disregard as to whether the statement was false or not.  Reckless disregard for the truth is not established merely by showing that the statements were made with preconceived objectives or insufficient investigation. Furthermore, ill will, spite or even hatred, standing alone, do not amount to actual malice. 'Reckless disregard' is not measured by whether a reasonably prudent man would have published or would have investigated before publishing, but by whether the publisher in fact entertained serious doubts concerning the truth of the statements published.

*Grebner v. Runyon*, 132 Mich. App. 327, 332-333 (1984) (citations omitted); *see also Lakeshore Cmty. Hosp. v. Perry*, 212 Mich. App. 396, 404 (1995) (applying the actual malice standard when tortious interference claim was likewise based on defamatory statements).

The court is mindful of its role at this early stage not to assess probabilities, but merely plausibility.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Plaintiff has alleged that doctors are issued unique identifying numbers, yet Healthgrades.com associated his profile with the criminal/medical board record of another doctor of the same first and last name (but notably, not the same middle name or middle

34

initial).  While the court agrees with Defendants that "a defendant's failure to investigate, without more, does not establish a reckless disregard of the truth," *Compuware Corp. v. Moody's Inv'rs Servs.*, 499 F.3d 520, 526 (6th Cir. 2007), the second part of that sentence reads: "the 'purposeful avoidance of the truth is in a different category' and may be sufficient to establish actual malice." *Id.* (citing *Harte-Hanks Commc'ns v. Connaughton*, 491 U.S. 657, 692 (1989); *Perk v. Reader's Digest Ass'n, Inc.*, 931 F.2d 408, 411 (6th Cir. 1991)).  Construing the facts alleged in the light most favorable to Saad, the court can fairly infer that Defendants could have, but chose not to, use readily- and publicly- available unique ID numbers, and the use of those numbers to verify and cross-check information before publication would have prevented similarly named individuals from being assigned the wrong information (for that matter, even using a middle initial as a cross-check before publication would have prevented this error).  On those facts and making all reasonable inferences in favor of Plaintiff, a jury could fairly find a) Defendants knew that at least some doctors share pertinent characteristics such as first and last name and location, b) that without using unique identifiers to identify doctors (or even checking middle names in addition to first and last), Defendants run a

high risk of posting incorrect information about individuals sharing first and last names in given geographic areas and c) that Defendants' knowledge of that risk constituted reckless disregard as to whether the information they posted was true or not.

Defendants further argue it was Plaintiff's burden to allege facts supporting the conclusion that Defendants interfered with "business opportunities [that] were nearing consummation[,]" but that he has not done so. *See Hobart-Mayfield, Inc. v. Nat'l Operating Comm'n on Standards for Ath. Equip.*, 48 F.4th 656, 669 (6th Cir. 2022). However, Saad alleges that "[u]pon information and belief, several patients of Plaintiff have reported to being turned appalled by the information published by Defendants, and therefore refused to be seen by Plaintiff for medical treatment into the future . . . ." *Id.* at ¶ 56. While Saad will undoubtedly need to produce those patients or potential patients for any success on this claim, that is sufficient at the motion to dismiss stage.

## V.   CONCLUSION

Therefore, the Court **GRANTS** Defendants' Motion to Dismiss as to Count II and **DENIES** the Motion as to Counts I and III.

**SO ORDERED**.

Date: October 30, 2024    <u>s/F. Kay Behm</u>
            F. Kay Behm
            United States District Judge